102 F.3d 301
 65 USLW 2472, 20 Employee Benefits Cas. 2289
 Maurice DIEHL, Individually, and Bernie Leigh, Individually
and on behalf of a class of all others similarly situated,
and International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America and its Local 765,
Plaintiffs-Appellants,
v.
TWIN DISC, INCORPORATED, Defendant-Appellee.
 No. 96-2087.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 24, 1996.
Decided Dec. 12, 1996.
 
 Michael B. Erp, Chirstine E. Giorgio, Laurie M. Burgess (argued), Katz, Friedman, Schur & Eagle, Chicago, IL, for Plaintiffs-Appellants.
 John S. Schauer, Thomas J. Piskorski, Deborah A. Kop, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant-Appellee.
 Before CUMMINGS, ESCHBACH, and FLAUM, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 In this appeal, we are called upon to decide whether Twin Disc promised certain insurance benefits for the duration of its retired employees' lives and, if so, to examine the nature of these benefits. When the company unilaterally changed the retired employees' coverage in 1993, the plaintiffs initiated this class action suit, which alleges that Twin Disc broke its promise. The district court believed that Twin Disc had reserved the right to change or discontinue the benefits at issue, and therefore granted summary judgment in favor of the company. We now vacate the district court's judgment and remand for further proceedings.
 
 I.
 
 2
 In January 1986, Twin Disc announced that it would cease manufacturing operations at its Rockford, Illinois plant and lay off almost all of the plant's bargaining unit employees. Negotiations promptly ensued between the company and Local 765 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "Union"), the union with which Twin Disc had bargained for more than thirty years. These negotiations produced the Shutdown Agreement at issue here, Paragraph 9 of which concerns retirees' insurance benefits:
 
 
 3
 9. (a) All persons retired prior to the date of termination of the [Retirement] Plan ... shall, notwithstanding any provision of the Insurance Agreement between the Company and the Union, as extended (hereinafter the "Insurance Agreement") be entitled for the lifetime of the pensioner (including the surviving spouse until death or remarriage) to the life insurance and hospitalization, medical and surgical expense benefit coverages as provided under the Extension of Coverages and Integration of Benefits provisions of Sections 5 and 6 of the Insurance Agreement.
 
 
 4
 Other arguably relevant provisions of the Shutdown Agreement are the integration clause representing that the "Shutdown Agreement constitutes the complete agreement between the parties on the subject of the cessation of operations" and the termination clause providing that the Shutdown Agreement "shall terminate ... in no event later than the end of the twelfth calendar month following the calendar month in which the last bargaining unit employee engaged in production is terminated." The termination provision, according to Twin Disc, took effect in 1990, one year after the last bargaining unit employee was discharged.
 
 
 5
 The 1983 Insurance Agreement to which the Shutdown Agreement refers was the latest in a series of such agreements dating back to 1961. Roughly every three years after 1961, Twin Disc and the Union had renegotiated collective bargaining agreements consisting of four separate agreements: a Basic Agreement, an Insurance Agreement, a Pension Agreement, and a Supplemental Unemployment Benefit Agreement. The insurance agreements, in turn, generally provided in Section 1 that benefits would be determined with reference to the "insurance program ... as set forth in the insurance section of the company's Employee's Manual," and that this program of benefits was subject to the amendments set forth in Section 2 of the insurance agreement.[1] Twin Disc emphasizes that the benefits of past retirees were always subject to renegotiation during collective bargaining sessions, and that, in fact, the Company and the Union decided in 1977 and 1980 to modify benefits received by previously retired employees. Both parties agree, however, that under the regime established by the successive insurance agreements and the Shutdown Agreement, retirees were covered under one of three different health insurance plans depending upon the individual retiree's date of retirement. It thus appears that although the benefits of previously retired employees were subject to renegotiation every three years, the Union and the Company maintained a certain continuity of coverage. As a result of this course of dealings, one could determine a particular retirees' benefits in any given year only by examining both the applicable insurance "booklet" and the modifications imposed by the insurance agreement then in effect. Through 1986, therefore, any changes to the insurance benefits of previously retired employees were implemented as a result of bilateral negotiations that occurred approximately every three years between Twin Disc and the Union.
 
 
 6
 As the above-quoted Paragraph 9 of the Shutdown Agreement indicates, Sections 5 and 6 of the 1983 Insurance Agreement must be consulted in order to ascertain the coverage to which retirees are entitled. We will discuss these sections in more detail, but suffice it to say for the moment that Section 6 permits Twin Disc to modify coverage to avoid duplication of Medicare benefits and that Section 5 provides that employees who have retired between certain dates shall be entitled to the coverage provided under the "program." The "program," as we have seen, is the description of benefits provided in the insurance section of the employees' manual, which apparently took the form of an "insurance booklet" that could be inserted to update the manual. The diligent reader who has followed our document-to-document scavenger hunt in search of clarity will be distressed to learn that the 1983 insurance booklet, like earlier versions of the same document, includes the following clause: "Your Employer hopes to continue the Plan indefinitely but, as with all group plans, the Plan may be changed or discontinued." The issue is further complicated by the plaintiffs' claim that this 1983 insurance booklet "pertained only to the active employees and not to those who had retired under an earlier insurance agreement."
 
 
 7
 After 1986 but before the actions at issue here, Twin Disc made certain unilateral changes in the retired employees' insurance coverage. These changes, according to the company, indicate that the plaintiffs were aware of, and initially accepted, the company's power to modify their insurance benefits. In October 1989, Twin Disc mailed a letter to retirees that "suggested ways to minimize the number of claim submissions" in order to reduce processing fees, as Charles Gibson, Twin Disc's vice president in charge of employee relations, later explained to Union representative William Penn, who wrote to Gibson to protest the changes. In addition, Twin Disc's October letter informed retirees of a toll-free number through which they would be required to pre-certify inpatient hospital care. Later, in April 1991, Twin Disc sent to employees, retirees and surviving spouses, a new insurance booklet. The letter accompanying the booklet explained, "There may have been few if any changes in your coverages. However, it's been our experience that some have lost or misplaced their original booklets and periodic replacements are appreciated." Though Twin Disc points to these two mailings as evidence of the parties' understanding that retirees' benefits could be modified unilaterally by the company, it remains to be seen whether actions by Twin Disc taken in 1989 and 1991 can shed any light on the intentions of the company and the Union when they negotiated the 1986 Shutdown Agreement.
 
 
 8
 In January 1993, Twin Disc replaced Aetna with Blue Cross as its insurance carrier and effected the changes to the retirees' insurance benefits that provoked this lawsuit. Given that these changes form the basis for this suit, it is a rather remarkable aspect of this appeal that the parties are rather vague when it comes to the extent of the changes. The plaintiffs insist that the "changes increased the amount of money that the retirees had to contribute toward their health insurance benefits, and dramatically decreased the amount of the Company's contributions," while Twin Disc, for its part, explains that "[t]he primary change ... modified the manner in which health insurance benefits coordinated with Medicare"--a change that Twin Disc would have been entitled to make under Section 6 of the 1993 Insurance Agreement. In the appendix to their brief, the plaintiffs have reproduced a chart prepared by Penn and purporting to outline the differences between benefits, pre- and post-1993. The record also contains a summary of the changes compiled by A. Christine Fieldbinder, Twin Disc's Manager of Compensation and Benefits. Twin Disc points out that the content of the plaintiffs' chart is still in dispute and explains that the non-Medicare-related changes "were relatively minor." In any event, Penn's chart, which the plaintiffs admit "may not be all inclusive," is of little aid to this court in determining the effect of the changes.
 
 
 9
 Although the plaintiffs may overstate the effect of the changes, it is fair to infer that the 1993 changes went beyond a simple coordination with Medicare benefits. Twin Disc's representation as to the nature of the "primary" change can leave little doubt that this was not the only change. Moreover, an internal company document suggests that Twin Disc itself distinguished between coordination with Medicare and other changes effected in 1993. In February 1992, Gibson drafted an internal memorandum discussing the planned changes, which were spurred in part by new accounting rules that would increase insurance costs. Gibson made the following observation with respect to retirees:
 
 
 10
 My first concern is making these changes applicable to current retirees. Whereas the change to a carveout integration method for Medicare should be accomplished in a low-profile manner, the increase in deductible and out-of-pocket will most likely create some unrest with existing retirees. Although I am not aware of any written documentation that commits the Company to preserving forever current retiree health insurance coverage, I would not be surprised if we were legally challenged by some disgruntled retirees.[2]
 
 
 11
 These were prescient remarks.
 
 
 12
 The plaintiffs filed their four-count complaint on December 30, 1993, asserting claims of breach of contract under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, breach of an employee benefit plan under Section 1132 of ERISA, 29 U.S.C. § 1132, violation of fiduciary duties under Section 1104 of ERISA, 29 U.S.C. § 1104, and promissory estoppel. The district court granted the plaintiffs' motion for class certification as to all but the promissory estoppel claim, but ruled that plaintiff Maurice Diehl was not a proper class representative.[3] Both parties then moved for summary judgment,[4] and the district court granted Twin Disc's motion in its entirety. The district court reasoned that the reservation-of-rights clause in the insurance booklet, indicating that "the Plan may be changed or discontinued," had been unambiguously incorporated into the Shutdown Agreement, and that Twin Disc therefore had the right to modify the retirees' insurance coverage.
 
 II.
 
 13
 The question before us is essentially one of contract interpretation, for the insurance benefits at issue here are "welfare" benefits, which, unlike pension benefits under ERISA, do not automatically vest in the absence of an agreement providing for lifetime entitlement. Bidlack v. Wheelabrator Corp., 993 F.2d 603, 604-05 (7th Cir.), cert. denied, 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993). We therefore apply federal principles of contract construction, meaning that we will give contract terms their "ordinary and popular" sense and avoid resort to extrinsic evidence when faced with unambiguous language. See GCIU Employer Retirement Fund v. Chicago Tribune Co., 66 F.3d 862, 865 (7th Cir.1995). We have noted that contractual disputes lend themselves to resolution on summary judgment. Id. at 864. The plaintiffs are entitled to all of the advantages usually accorded the non-moving party appealing from a district court's grant of summary judgment; but a contract's meaning is a matter of law, id., and where there is no contractual ambiguity, there is no resort to extrinsic evidence, hence no factual dispute to preclude summary judgment. Of course, we cannot interpret "the contract," until we identify the contract that we would interpret.
 
 
 14
 Before we do so, however, there is some question as to whether we need reach the central issue briefed by the parties, whose positions could not be more starkly opposed. The plaintiffs contend that the Shutdown Agreement secured for retirees a lifetime entitlement to the exact same insurance benefits they enjoyed in 1986, while Twin Disc insists that it retained the right to discontinue benefits at any time, or at least after 1990, when the Shutdown Agreement expired. In fact (to hear Twin Disc tell it) whatever insurance benefits the plaintiffs continue to receive are a mere gratuity, the result of the company's beneficence. In light of the extreme stances reflected in the parties' briefs and presentations at oral argument, it would be easy to forget that this suit does not involve a termination of benefits, but rather modifications to benefits that were made in 1993. It is conceivable that we could discuss the propriety of these modifications without any reference to the duration of retiree benefits. Yet we have considered and rejected such an approach under similar circumstances, see Bidlack, 993 F.2d at 610 (opinion of the court); id. at 614 (Easterbrook, J., dissenting), and we reject it again today. Given the district court's holding that the retirees do not have a right to lifetime benefits, and the fact that Twin Disc presses the point so forcefully on appeal, we believe that it is incumbent upon us to resolve the question. "If [the retired employees] have no contractual guaranty of benefits, they had better start shopping around for other medical insurance." Bidlack, 993 F.2d at 610. For the sake of clarity, we will divide our discussion somewhat artificially into two parts. In Part II.A., we ask whether the retirees' have a vested right to benefits. Because we conclude that they do, we go on in Part II.B. to examine the scope of this right.
 
 A.
 
 15
 We begin by observing that the language upon which the plaintiffs base their claim to lifetime insurance benefits stands apart from language we have considered in similar cases in recent years. We are more commonly asked to find an intent to create lifetime entitlements despite terms that are ambiguous or completely silent on the issue. For example, in Senn v. United Dominion Industries, Inc., 951 F.2d 806 (7th Cir.1992), we determined that "the relevant Collective Bargaining Agreements and plan documents incorporated therein ... [were] void of any language that would provide the basis for finding an ambiguity in regard to a vestment of lifetime welfare benefits," id. at 815, and therefore held that the plaintiff retirees could not overcome the presumption that " 'entitlements established by collective bargaining agreements do not survive their expiration or modification,' " id. at 816 (quoting Merk v. Jewel Cos., Inc., 848 F.2d 761, 763 (7th Cir.), cert. denied, 488 U.S. 956, 109 S.Ct. 393, 102 L.Ed.2d 382 (1988)). In Bidlack, we held that because "the agreements are not silent on the issue, ... [but] merely vague," 993 F.2d at 608, the plaintiffs were entitled to have a factfinder determine whether they were receiving welfare benefits "as a matter of grace or of right," id. at 610. Involving silence, ambiguity, or vagueness with respect to vesting of benefits, it was natural that these cases should provoke discussions about the presumptions that should guide a court when asked to find an entitlement to lifetime coverage. See Bidlack, 993 F.2d at 607; id. at 611-12 (Cudahy, J., concurring); Senn, 951 F.2d at 816; see also Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 565 (7th Cir.1995) ("Murphy's claims rest almost entirely on extrinsic evidence so we must consider its proper place in our inquiry.").
 
 
 16
 Here, by contrast, it is not obvious that we need resort to such presumptions. The plaintiffs can point to an explicit and seemingly unambiguous provision that vests welfare benefits--Paragraph 9 of the Shutdown Agreement, which provides that the retired employees "shall, notwithstanding any provision of the Insurance Agreement ..., be entitled for the lifetime of the pensioner ... to the life insurance and hospitalization, medical and surgical expense benefit coverages as provided under the Extension of Coverages and Integration of Benefits provisions of Sections 5 and 6 of the Insurance Agreement." If the rule that contractual provisions are to be given their ordinary and popular sense has any guiding force, we believe that the language just quoted must mean what it says: the retired employees shall be entitled to welfare benefits for their lifetime.
 
 
 17
 Twin Disc objects that Paragraph 9 of the Shutdown Agreement, by its own terms, incorporates Section 5 of the Insurance Agreement, which in turn incorporates the reservation-of-rights clause contained in the insurance booklets. The district court agreed, reasoning that "the shutdown agreement unambiguously incorporated the change or discontinuation of the employee manuals and that such incorporation unambiguously gave defendant the right to change or discontinue the health care benefits." We respectfully do not believe that the Shutdown Agreement can be read to have incorporated unmodified the "change or discontinue" language contained in the insurance booklets. What the interpretation urged by Twin Disc ignores is that the Shutdown Agreement itself was an independent contract, supported by separate consideration and capable of modifying or supplanting prior contractual arrangements.
 
 
 18
 It is true that when potentially conflicting provisions coexist within the same document, or within a single contract formed of several documents, the rule that contractual provisions be read as parts of an integrated whole will lead a court to seek an interpretation that reconciles those provisions. See In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 58 F.3d 896, 904 (3d Cir.1995) ("[T]he court found that seemingly inconsistent provisions, such as those permitting modification of the plan and those indicating that benefits last for life, must be construed to be harmonious.") (discussing DeGeare v. Alpha Portland Indus., Inc., 652 F.Supp. 946 (E.D.Mo.1986), aff'd, 837 F.2d 812 (8th Cir.1988), vacated and remanded on other grounds, 489 U.S. 1049, 109 S.Ct. 1305, 103 L.Ed.2d 575 (1989)). At times, this may compel a rather forced construction, such as the following explanation offered by the Third Circuit in the Unisys case: "An employer who promises lifetime medical benefits, while at the same time reserving the right to amend the plan under which those benefits were provided, has informed plan participants of the time period during which they will be eligible to receive benefits provided the plan continues to exist." In re Unisys Corp., 58 F.3d at 904; see also Chiles v. Ceridian Corp., 95 F.3d 1505, 1512 n. 2 (10th Cir.1996) ("[T]he weight of case authority supports the Unisys approach, that a reservation of rights clause allows the employer to retroactively change the medical benefits of retired participants, even in the face of clear language promising company-paid lifetime benefits."). Although a layperson untrained in the nuances of the law might greet this explanation with a quizzical expression, we do not mean to impugn the logic of our sister court. Statements such as the one we have just quoted merely reflect a court's understanding of what it takes to overcome the presumption that welfare benefits do not vest, combined with the court's reluctance to interpret a contract as being at war with itself.
 
 
 19
 Fortunately for us, we need not undertake such interpretive gymnastics. In this case, we have an agreement (the Shutdown Agreement) that refers to an earlier agreement (the 1983 Insurance Agreement) that granted a certain level of benefits to retirees based upon their respective dates of retirement. Twin Disc is correct that we cannot understand exactly what those benefits were without looking to the insurance booklet (or booklets). Indeed, it is possible to view the Insurance Agreement and the insurance booklet "thereafter issued" in 1983 as components in a single contract. Were the year 1984, for example, and were we called upon to interpret the 1983 Insurance Agreement in the first instance, we might need an interpretive strategy that would permit us to reconcile Twin Disc's supposed right to "change or discontinue" coverage with the company's apparent promise of three-years' coverage.
 
 
 20
 This is not true for the Shutdown Agreement, which unambiguously granted lifetime benefits to the retirees and then referred to the 1983 agreement for the purpose of identifying their level of benefits. The Shutdown Agreement was not executed in close temporal proximity to either the 1983 Insurance Agreement or the preceding insurance booklets, nor did the Shutdown Agreement share with this earlier agreement a common underlying consideration. Cf. Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co., 73 F.3d 727, 731 n. 2 (7th Cir.1996) ("Both the CBA and the benefits plan were negotiated by the same parties ..., they were executed at the same time, they were both supported by the same consideration, and the CBA expressly incorporated the plan by reference."); Murphy, 61 F.3d at 567 ("We disagree [that the Plan cannot be unilaterally amended or terminated] because the terms of the CBA and the Plan were negotiated and executed, and therefore must be read together, ... and because both the Plan and the CBA rest on the same consideration: the mutual promises set forth in the CBA."). That being the case, we see no reason why the "change or discontinue" language in the insurance booklets should take precedence over the Shutdown Agreement's clear provision for lifetime benefits. To the contrary, the promise of lifetime benefits abrogated whatever right Twin Disc may have had to terminate coverage.
 
 
 21
 On that note, it is worth pausing for a moment to consider the precise language that supposedly provides the basis for Twin Disc's right to discontinue benefits. Upon close examination, it becomes clear that this reservation of rights is itself not as devoid of ambiguity as Twin Disc would have us believe. The relevant clause appears in the insurance booklets, which apparently were prepared by Twin Disc's insurance carrier. The 1983 booklet contains language substantially similar to earlier versions: "Your employer hopes to continue the Plan indefinitely but, as with all group plans, the Plan may be changed or discontinued." The phrase is descriptive, and the possibility of change is announced in the passive voice. ("Changed or discontinued by whom?" one might ask.) Given the fact that the booklet was prepared by the insurance carrier (Aetna, in this case), one plausible reading of the clause would be to regard it as providing notice that the underlying contract between the insurer and the company, of itself, created no rights in the company's employees. In fact, this might very well be the best reading under the 1983 Insurance Agreement, in light of Twin Disc's contractual undertaking to provide coverage for a specific length of time. We need not decide this matter, however, for we have already stated that Twin Disc's right to discontinue, if such a right there was, cannot survive the subsequent promise to provide lifetime benefits. But the unsure foundation of the putative right to discontinue provides an additional reason to hesitate before endorsing Twin Disc's interpretation of the Shutdown Agreement.
 
 
 22
 Twin Disc still has a leg to stand on: Paragraph 18, which provides that the Shutdown Agreement "shall terminate, except with respect to paragraph 16 of this Shutdown Agreement, ... in no event later than the end of the twelfth calendar month following the calendar month in which the last bargaining unit employee engaged in production is terminated." The company reasons that the last bargaining unit employee must have been discharged no later than August 1989, because in that month the Union disclaimed any interest in representing bargaining unit employees at the Rockford plant. Therefore, according to Twin Disc, the Shutdown Agreement expired pursuant to Paragraph 18 in September 1990, along with the retirees' rights to lifetime benefits. "Sometimes, however, a contract creates entitlements that outlast it." Bidlack, 993 F.2d at 606. As we observed in Bidlack, the presumption that rights do not survive the expiration of a collective bargaining agreement is just that--a presumption--, and we have already explained why that presumption should not apply in this case.
 
 
 23
 Twin Disc, however, observes that Paragraph 18 expressly excludes from its coverage Paragraph 16, which obligated the company, inter alia, to recognize the seniority of former employees should it reactivate the plant within twenty-four months after shutdown. It therefore urges us to invoke the expressio unius doctrine and to find by negative implication that the lifetime promise of Paragraph 9 falls within the ambit of Paragraph 18's expiration clause. We remain unpersuaded. Though its Latin phrasing lends it an authoritative ring, the maxim expressio unius est exclusio alterius ("the expression of one thing is the exclusion of the other") is at best an aid in interpretation, not a hard-and-fast rule, and we do not believe that Paragraph 18 cries out for its application. Cf. Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir.1995) ("While this interpretive maxim is not always dispositive, it carries weight; and when, as now, there is absolutely nothing in the agreement's text that hints at some additional item lurking beyond the enumerated list, we see no reason why the maxim should not be controlling."). When the Shutdown Agreement was executed, it was very likely that the time periods applicable to Paragraph 16 and Paragraph 18 would coincide: Paragraph 16's obligations are to be measured from the date that "manufacturing operations are permanently discontinued," while Paragraph 18 looks to the date when "the last bargaining unit employee engaged in production is terminated." It therefore was foreseeable that there might be confusion as to whether Paragraph 18's twelve-month obligation limited the twenty-four-month obligation that Paragraph 16 seemed to create. The obligation created by Paragraph 9, which explicitly extended for life the benefits that the retirees had already been receiving, differs in quality from the duty imposed by Paragraph 16. The exclusion of Paragraph 16 from the Shutdown Agreement's expiration provision therefore tells us nothing about whether Paragraph 9 created a right that survived the Agreement. Cf. Chiles, 95 F.3d at 1512-13 (applying expressio unius doctrine and rejecting alternative reading that would render termination exception superfluous). We hold that Paragraph 9 established vested rights to lifetime insurance benefits.
 
 B.
 
 24
 Yet the foregoing analysis can be little more than a prologue (albeit lengthy), for it is one thing to declare that the retirees are entitled to lifetime insurance benefits; it is another to decide precisely what those benefits are. Between the plaintiffs' insistence that the retired employees have a right to the exact benefits they enjoyed in 1983 and Twin Disc's proposed interpretation, that they have a right to lifetime benefits that may be discontinued, lies a range of possibilities. As we stated at the outset, Twin Disc modified but did not terminate the retirees' benefits in 1993. It therefore would be possible for us to conclude that the modifications did not violate the plaintiffs' rights, despite our holding that those rights were vested.
 
 
 25
 Happily, the documents we have examined are clear in at least one respect. As noted earlier, Section 6 of the 1983 Insurance Agreement permits modification of coverage to avoid duplication of certain statutory benefits, including Medicare. There is nothing inconsistent in recognizing both the retirees' lifetime entitlement and Twin Disc's right to make these modifications. Twin Disc maintains that the principal change it introduced in 1993 was to alter the formula by which copayments were calculated for Medicare recipients: the copayment would be a percentage of the entire medical bill, rather than a percentage of the amount left to be paid after deducting for Medicare. Although this change undoubtedly increased copayments for certain retirees, it put them in no worse a position than they would have been absent Medicare. We therefore see no reason why Twin Disc should not be permitted to alter the copayment formula in this fashion for retired employees receiving Medicare.
 
 
 26
 If this were the only change that had taken place in 1993, we would be at an end. The plaintiffs, however, contend that Twin Disc went beyond this single modification, and, as we indicated earlier, it seems likely that this is the case. We therefore must press on, to determine whether the contract that we are analyzing provides any guidance, apart from the provisions relating to coordination of benefits, with respect to Twin Disc's right to make modifications.
 
 
 27
 The plaintiffs maintain that they contracted for exactly the same insurance coverage that they were receiving by virtue of the 1983 Insurance Agreement. At the other extreme, Twin Disc (given our holding above) presumably would argue that the company's duty to provide lifetime coverage is satisfied so long as the company maintains some insurance coverage, however reduced. The interpretive dilemma that we confront here is one of vagueness rather than ambiguity. We are faced, not with a choice between two reasonable interpretations, but with a continuum of options that lies between these two intuitively implausible results. If Twin Disc were permitted to "modify" coverage until it became all but nominal, the promise of lifetime benefits would begin to look rather illusory. On the other hand, we cast a cold eye on the claim that in 1986 Twin Disc contracted to provide for the life of its retirees the precise benefits described in insurance booklets drafted ten or twenty years previously.
 
 
 28
 It is necessary to return the regime that was established by the 1983 Insurance Agreement. That agreement, after all, is the benchmark to which the Shutdown Agreement refers. In their statement of uncontested material facts offered in support of their motion for summary judgment, the plaintiffs described the status quo as it existed prior to 1993: "Prior to 1993, the certified class of retirees ... were covered under three different health insurance plans depending upon the date the employee retired: the 'Basic and Major Medical Plan', the [']Basic and Major Medical with dental, Vision and Hearing Benefits[,'] and the [']$100 Comprehensive Plan'." Twin Disc did not contest this synopsis, which was drawn entirely from the affidavit of Fieldbinder, its Manager of Compensation and Benefits.
 
 
 29
 It is not entirely clear how this tripartite framework was established--a potentially significant question. If the 1983 Insurance Agreement contemplated that Twin Disc could dictate the level of coverage merely by issuing new insurance booklets, this understanding would support Twin Disc's right to modify coverage unilaterally. The plaintiffs maintain that the insurance booklet issued in 1983 "pertained only to the active employees and not to those who had retired under an earlier insurance agreement." Under the plaintiffs' view, therefore, the retirees' benefits were based on the booklets in effect at their date of retirement, presumably as modified by amendments in the insurance agreements. There is evidence in the record, however, suggesting that the 1983 insurance booklet, which was adopted following the execution of the 1983 Insurance Agreement, applied to and was sent to all retired employees, as well as active employees. This reading of the facts is reinforced by the language of the 1983 Insurance Agreement, which referred to "the insurance program ... as set forth in the insurance section of the Employee's Manual hereafter issued." (Emphasis added.) In addition, as Twin Disc is quick to remind us, a new insurance booklet was issued to retirees in 1991. Yet Twin Disc does not do a good job of explaining to us how it was that the company managed to maintain three distinct benefit levels based on date of retirement and, at the same time, to summarize these three plans of coverage within the same insurance booklet. Regardless of how this sorting among retired employees was accomplished, however, the persistence of a certain level of coverage over time strongly suggests that when, in 1986, the Union and the company made reference to the 1983 Insurance Agreement, they had in mind certain substantive insurance benefits.[5]
 
 
 30
 By the same token, we see nothing to indicate that the Shutdown Agreement established a right to a particular insurance carrier, or even to a particular plan. Even in its weakest form, as we have seen, the reservation-of-rights clause included in the insurance booklets gave notice that the underlying group contract between Twin Disc and its insurance carrier created no rights to which the retired employees could lay claim. Rather, the Insurance Agreement obligated Twin Disc to secure a certain level of benefits, and Twin Disc presumably remained free to negotiate with various insurance carriers (or to self-insure) and to impose cost-saving measures that did not substantially reduce benefits. But in exercising this discretion, Twin Disc could not have been free to arrange for coverage that would eviscerate the promise of benefits. We therefore would read the Shutdown Agreement as requiring Twin Disc to expend reasonable efforts to secure coverage at a level substantially commensurate with the benefits provided under the 1983 Insurance Agreement. We believe that this understanding most accurately reflects the intent of the parties. It is also consistent with their behavior following the execution of the Shutdown Agreement. Twin Disc notes that the plaintiffs did not sue in 1989 when the company instituted a pre-certification requirement, or in 1991 when it mailed a new insurance booklet that introduced "few if any changes." Under our interpretation, however, it would have been entirely permissible for Twin Disc to make these minor alterations.
 
 
 31
 In November 1992, Twin Disc mailed a letter to retired employees to announce the upcoming modifications in their coverage. This letter explained that the company had chosen Blue Cross to replace Aetna as its carrier and assured the retirees that "[w]e have attempted to duplicate your benefits as closely as possible." If this representation was accurate, then there should be no reason for a court to find that the changes violated the plaintiffs rights under the Shutdown Agreement. Examining the summary of modifications appended to Fieldbinder's affidavit, we might be inclined to agree with Twin Disc that these changes were not so significant as to infringe upon the retirees' vested rights. The plaintiffs, however, insist that the changes were severe, and we cannot so easily dismiss their appeal from the court's grant of summary judgment against them. We therefore believe that the proper course is to remand for a finding as to the precise nature of the modifications that were implemented in 1993. The plaintiffs will bear the burden of demonstrating that the changes brought their benefits below a level reasonably commensurate with the coverage that they had enjoyed theretofore. This may involve a more detailed inquiry, not only into the nature of the changes implemented in 1993, but also into the coverage put in place by the 1983 Insurance Agreement.
 
 
 32
 We caution that it will not suffice for the plaintiffs to demonstrate that the changes have increased payments for some retired employees. The changes should be examined for their effect on the class of retirees as a whole, to determine if they have significantly reduced their general level of benefits. In addition, individual modifications should not be scrutinized in isolation. In other words, the changes must be examined in their totality for their effect upon the class of retirees as a group.
 
 
 33
 We recognize that the interpretation we have laid out today is itself not devoid of vagueness. We nonetheless have confidence in the district court's ability to direct the proceedings below in conformity with our understanding of the Shutdown Agreement. It is also possible that our holding will provide the basis for a new understanding between the parties, one that accommodates both the retirees' understandable concern for the security of their welfare benefits and Twin Disc's legitimate interest in controlling costs whose escalation may have been unforeseen in 1986. Regardless, it is not the business of the courts "to relieve contract parties of their improvident commitments." Bidlack, 993 F.2d at 609.[6]
 
 
 34
 The judgment of the district court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 Unlike earlier versions, which referenced the "insurance section of the Employee's Manual heretofore issued" (emphasis added), the 1983 Insurance Agreement referred to the insurance section "hereafter issued" and therefore did not include a list of amendments to the insurance program
 
 
 [2]
 We cite this passage not for any light it may shed on the meaning of the Shutdown Agreement, but only as evidence of the nature of the modifications Twin Disc implemented in January 1993
 
 
 [3]
 Pursuant to Federal Rule of Civil Procedure 23(b)(2), the district court certified the following class:
 All retired hourly employees of Twin Disc, Inc. at Local 765 who retired prior to January 1, 1987 and their spouses and the surviving spouses of such retired employees now deceased and all other eligible participants who are participants or beneficiaries of the retirement health insurance coverage established pursuant to a series of collectively bargained insurance agreements and the collectively bargained Shutdown Agreement of March 31, 1986 between Twin Disc and the UAW and its affiliated Local 765
 1995 WL 330637, at * 5, * 16 (N.D.Ill. May 30, 1995).
 
 
 [4]
 The plaintiffs did not move for summary judgment on their promissory estoppel claim, and they do not appeal the district court's ruling as to that claim
 
 
 [5]
 Reminding us that the benefits provided under the successive insurance agreements were expressly limited to the agreements' three-year terms, Twin Disc scoffs at the plaintiffs for making "a big deal" out of the existence of three different benefit levels. Twin Disc is correct to argue that the notion that the benefits vested under the insurance agreements is belied by the fact that the insurance coverages provided under the insurance agreements were subject to renegotiation every three years. But it is also significant that these agreements were negotiated in a bilateral setting. Once the Union and the company had negotiated for lifetime benefits in a final Shutdown Agreement, it would be logical for the parties to assume that, since there would be no future negotiations, there would be no change of benefits--that is, unless Twin Disc retained a right to modify unilaterally the plan of coverage. This latter possibility is the reason why we have paused to discuss the means of maintaining different benefit levels. If the 1983 Insurance Agreement anticipated that Twin Disc would issue a new description of coverage applicable to all past retirees, this suggests a source, in addition to the reservation-of-rights clause, of Twin Disc's power to modify coverage. While it would have been helpful, therefore, to have had a clearer answer to this mystery, we do not deem it essential. We assume that Twin Disc had some power to modify coverage; the question is to what extent
 
 
 [6]
 We agree with the plaintiffs that Twin Disc's argument that this case should be dismissed for failure to exhaust administrative remedies is without merit