**Andre SALAMOUNI, Plaintiff,**

v.

**The DAIWA BANK, LIMITED, and WSR Servicing Company, Inc., Defendants.**

No. 95 C 7705.

United States District Court,
N.D. Illinois,
Eastern Division.

June 2, 1997.

Barry Alfred Gomberg, Barry A. Gomberg & Associates, Chicago, IL, Jac A. Cotiguala, Law Offices of Jac A. Cotiguala, Chicago, IL, for plaintiff.

Michael Lawrence Mulhern, Winston & Strawn, Chicago, IL, James P. Milkeen, Manatt, Phelps & Phillips, Los Angeles, CA, for defendants.

### OPINION AND ORDER

NORGLE, District Judge:

Plaintiff Andre Salamouni ("Salamouni") is suing for retirement medical benefits. Be-

fore the court is the motion for partial summary judgment of Defendants. For the following reasons, the motion is denied.

### I. FACTS [1]

Salamouni worked in the commercial banking division at Lloyds Bank PLC ("Lloyds") for approximately twenty years. There, Salamouni participated in a variety of employee benefit plans, including Lloyds' medical benefits program. Lloyds offered its medical benefits program to both active and retired employees through its health insurance carrier, The Equitable Life Assurance Society ("Equitable"). A series of insurance booklets outlined the Lloyds program, the last booklet being published in 1987 ("Lloyds 1987 booklet"). All Lloyds program participants received the Lloyds 1987 booklet, including Salamouni. The Lloyds program provided coverage to employees as follows: "All full time U.S. employees and Expatriates in the North America Head Office except those who normally work less than 20 hours per week." (Salamouni 12(N) Ex. F.)

Regarding retirement, the relevant portion of the Lloyds 1987 booklet states:

BENEFITS FOR RETIRED EMPLOYEES/ACTIVE OR RETIRED EMPLOYEES AGE 65 OR OVER

When an insured individual under age 65 retires, Medical Care Benefits, Major Medical and Dental Benefits described in this booklet will continue to apply for retired employees and their eligible dependents.

\* \* \* \* \* \*

When an insured Active or Retired employee attains age 65, the Major Medical and Dental Benefits described in this booklet will continue except that the benefits will be coordinated with Medicare.

(Salamouni Dep. Ex. 1 at 6.)

Regarding termination of medical benefits, the Lloyds 1987 booklet states:

WHEN INSURANCE ENDS

---

1. The following facts are taken from the parties Local Rule 12 statements of material fact. In a separate order of this same date, the court ruled on several objections to Salamouni's 12(N) response to Daiwa's proffered 12(M) statement.

Your insurance ends when any of the following events occurs:

(a) you leave our employ.

(b) you are no longer eligible.

(c) the Group Policy ceases.

A dependent's insurance ends when any of the following events occurs:

(a) your insurance ends.

(b) the dependent is no longer an eligible dependent.

(Salamouni Dep. Ex. 1 at 8.)

The Lloyds 1987 booklet contained no statement that medical benefits, including those available to retirees, were vested, could not change, or otherwise would be available for the lifetime of participants. Salamouni understood that the Lloyds program could be amended, modified, or terminated at Lloyds' sole discretion. During the years of Salamouni's employment, Lloyds periodically and unilaterally adjusted the deductible and premium levels under the Lloyds program; those were the only changes made during the time Salamouni worked for Lloyds.

Other than annual memoranda announcing those changes, and a 1988 letter offering early retirement, the Lloyds 1987 booklet and its predecessors were the only documents which Salamouni ever received from Lloyds explaining the terms of its program. Salamouni had only two discussions with Lloyds officials regarding the terms of the Lloyds 1987 booklet. The first was with his supervisor, Peter Ellis; and the second was with Lloyds' personnel manager, James Hinchey ("Hinchey").

In May 1988, Salamouni received the letter, from Hinchey, offering him early retirement. The letter explained the benefits under an early retirement program which Lloyds offered to staff members of a certain age in anticipation of Lloyds' disposing of its United States commercial banking operation. Under the early retirement program, medical benefits would be the same as those provided to active employees. Regarding the medical benefits, Hinchey wrote:

You will be able to continue your coverage under the Equitable Health Plan, and your monthly contribution effective June 1, 1988 towards family coverage would be:

$ 50.00 Medical Plan

$ 8.00 Dental Plan

Once you reach age 65 the amount of your contributions and the plan coverage would change so that coverage is coordinated with Medicare. You would be advised of the rate and plan charges upon reaching age 65.

\* \* \* \* \* \*

Whilst the Bank intends to provide Health Care and Life Insurance benefits for retirees, this cannot be guaranteed and the Bank reserves the right to modify benefit and contribution levels.

(Salamouni Dep. Ex. 2.)

The medical benefits program available to Lloyds' early retirees was the same as that offered to active employees and normal retirees. Salamouni elected to continue his employment with Lloyds, rather than take early retirement.

In the Fall of 1989, Defendant The Daiwa Bank, Limited ("Daiwa") announced an agreement to acquire Lloyds' United States commercial banking division. Salamouni learned about the agreement during a meeting with Lloyds' regional general manager, Barry Maddams.

Prior to the effective date of acquisition, on December 21, 1989, Daiwa's managing director and general manager, Kenji Yasui ("Yasui"), sent a letter to Lloyds' United States commercial banking executives, including Salamouni. The letter addressed the pending acquisition and provided "more concrete information about our plans and intentions." (Salamouni Dep. Ex. 4.) Regarding the terms of employment that would apply if Salamouni elected to work for Daiwa, as opposed to taking early retirement from Lloyds, Yasui's letter stated:

Your base salary with Daiwa following the closing will at least equal your salary with Lloyds immediately prior to the closing, and the other terms of your employment with Lloyds prior to the "closing date" (set

forth as an Exhibit to this letter[2] will continue to benefit you as employees of Daiwa following the closing).

Daiwa will establish employee benefit plans at or prior to the closing similar to the Lloyds Bank U.S. Pension Plan and the Lloyds Employee Savings (401K) Plan, and these Lloyds' [sic] plans will transfer sufficient assets to the new Daiwa plans to insure a complete carry-through of plan benefits on terms no less favorable to you and your colleagues who join Daiwa.

(Salamouni Dep. Ex. 4.)[3] The letter contains Yasui's signature. At the bottom of the letter appears a signature line with the word "Accepted" appearing beneath the line. Salamouni's signature appears on the line.[4] Rather than "accepting," Salamouni could have taken early retirement under the Lloyds plan, which provided retirement medical benefits. Lloyds continues to provide its retirees with medical benefits.

In meetings with Lloyds employees prior to the acquisition, Yasui told Salamouni that Daiwa would provide the same benefits as those he enjoyed at Lloyds. Yasui made such statements during several meetings as well as social events.

During the same time period, Maddams and other Lloyds officials told Salamouni that the terms of his employment would not change if he elected to work for Daiwa. Maddams repeated several times at a meeting in November 1989 that all of the Lloyds executives' benefits and all of their employment terms would be at least the same, if not better, with Daiwa.

Furthermore, Jun Okuda, general manager of United States planning department of Daiwa, testified that Mr. Abekawa, president of Daiwa, gave a speech to key Lloyds employees prior to the acquisition, stating that Daiwa would give those employees the same benefits that they enjoyed at Lloyds.

Hinchey and Jane Gerhard ("Gerhard") (who became Daiwa's vice president of personnel services after the acquisition), while they were Lloyds employees, repeated Okuda's assurances. Salamouni specifically spoke to them concerning his pension and health insurance benefits. Hinchey and Gerhard told Salamouni that all benefits, including medical benefits, would remain in effect after the acquisition. Drewery testified that Gerhard stated to him that, in 1989, assurances had been made to Lloyds employees to provide post-retirement health care benefits for people coming from Lloyds to Daiwa.

The acquisition was effective March 1, 1990. Salamouni worked for Daiwa from that date until his retirement on September 30, 1995.[5] From the time Salamouni began to work for Daiwa until his retirement, he was an executive.

Effective March 1, 1990, Daiwa issued a new booklet outlining the terms of its medical benefits program. The Daiwa 1990 booklet provided coverage for "All full-time Non–Executive employees" (Salamouni 12(N) Ex. G). The language in the Daiwa 1990 booklet pertaining to medical "Benefits for Retired Employees" and "When Insurance Ends" is identical to that used in the Lloyds 1987 booklet. The Daiwa 1990 booklet also stated:

Your employer reserves the right to:

(a) modify, amend or change the provisions of the Group Policy(ies) subject to the Equitable's approval;

(b) terminate that Group Policy(ies) on any date on which your Employer must pay premiums to the Equitable;

(c) require, change or discontinue, at any time contributions toward cost of coverage under this plan; and

(d) modify, amend, change or discontinue this plan at any time.

(S Dep. Ex. 9 at 55.)

Daiwa distributed the Daiwa 1990 booklet to all program participants and to Salamouni.

---

**2.** Salamouni does not believe that he received such an exhibit.

**3.** David Drewery ("Drewery"), general manager of the commercial banking division of Daiwa, testified that he understood Yasui's letter as assuring that all benefits Drewery received at Lloyds would continue at Daiwa, including medical benefits.

**4.** The court notes that, despite the typed word "Accepted," Defendants contend that Yasui's letter was not an "offer."

**5.** Defendant WSR Servicing Company is the Plan Sponsor of certain employee benefit plans instituted and maintained by Daiwa.

The Daiwa 1990 booklet contained no statement that medical benefits were vested, would not change, or otherwise would be available for the lifetime of participants.

Effective April 1, 1992, Daiwa amended its medical benefits program. Daiwa announced the changes by publishing and distributing a Summary Plan Description entitled "Employee Benefits For You and Your Family" (Daiwa 1992 SPD). Unlike the Daiwa 1990 booklet, the Daiwa 1992 SPD omitted any provision regarding retirement medical benefits. The Daiwa 1992 SPD also provided that Daiwa could make additional changes in the future: "PLAN TERMINATION: The Plan Sponsor reserves the right to modify, suspend or terminate the Plan at any time. The employer does not promise the continuation of any benefits nor does it promise any specific level of benefits at or during retirement." (Hinchey Dep. Ex. 1 at 4.) The Daiwa 1992 SPD also did not contain a statement that medical benefits were vested, could not change, or otherwise would be available for the lifetime of participants. Effective April 1, 1995, Daiwa published a revised Summary Plan Description, again entitled "Employee Benefits For You and Your Family" ("Daiwa 1995 SPD"). The Daiwa 1995 SPD contained the same "Plan Termination" language as the Daiwa 1992 SPD. The Daiwa 1995 SPD also omitted any provision regarding retirement medical benefits. The Daiwa 1995 SPD was in effect at the time of Salamouni's retirement. There was no statement in the Daiwa 1995 SPD that medical benefits were vested, could not change, or otherwise would be available for the lifetime of participants.

Salamouni believes that he first learned that retirement medical benefits were no longer available in March 1993, when he received a letter announcing a workforce reduction from Gerhard. Salamouni testified that, to the best of his knowledge, Daiwa never provided retirement medical benefits.

Later, Salamouni and other former Lloyds employees lobbied for a retirement medical benefits program for Daiwa retirees. Salamouni, as well as other former Lloyds employees, believe that retirement medical benefits were among the benefits which would be continued by Daiwa after the acquisition. That belief is based on Yasui's letter and pre-acquisition statements by Daiwa and Lloyds officials that benefits at Daiwa would be the same, if not better, as those enjoyed at Lloyds.

Salamouni retired from Daiwa effective September 30, 1995. At that time, Daiwa did not have a retirement medical benefits program, nor did it have one at any time thereafter.

Based on his understanding of the "normal practice" and the failure of the Lloyds 1987 booklet to state otherwise, Salamouni claims that Defendants are obligated to provide medical insurance to Salamouni and his spouse for the remainders of their lives.

In response, Defendants assert that they are entitled to summary judgment on Salamouni's claim that Daiwa must provide him and his spouse with retirement medical benefits. They contend that they permissibly unilaterally withdrew Salamouni's retirement medical benefits, as medical benefits do not vest under ERISA and such benefits may be withdrawn. Accordingly, Defendants aver that Salamouni is not entitled to retirement medical benefits.

## II. DISCUSSION

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *GCIU Employer Retirement Fund v. Chicago Tribune Co.*, 66 F.3d 862, 864 (7th Cir. 1995). That is, whenever "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir.1997). When considering a motion for summary judgment, the court must review the entire record, drawing all reasonable inferences from the record in the light most favorable to the non-movant. *Cornfield by Lewis v. Consol. High School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993). The burden of establishing the lack of

any genuine issue of material fact rests with the movant. *Jakubiec v. Cities Serv. Co.,* 844 F.2d 470, 473 (7th Cir.1988).

The instant case is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. The retirement medical benefits at issue fit within ERISA's definition of welfare benefits. *See* 29 U.S.C. § 1002.

### A. Vesting of Welfare Benefits

Salamouni contends that he has a contractual right to vested retirement medical benefits based on the Yasui letter and the various oral assurances that his benefits would not change.

■ ERISA exempts welfare benefit plans from the automatic vesting requirements placed on pension plans. *Diehl v. Twin Disc. Inc.,* 102 F.3d 301, 305 (7th·Cir.1996). However, ERISA does not forbid the vesting of welfare benefits, if the parties vest them by written contract. *Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 605 (7th Cir.1993).

■ Because an agreement modifying a written plan and vesting welfare benefits must be in writing, the court may not consider oral statements made to Salamouni concerning his benefits. *See Doe v. Blue Cross & Blue Shield United of Wisc.,* 112 F.3d 869, 875–76 (7th Cir.1997). Regardless of Salamouni's perhaps unfortunate understanding to the contrary, oral promises to provide benefits simply do not count in ERISA analysis. However, it does not necessarily follow that ERISA also forbids written contractual modifications of written plans. *Id.* Although such written contracts usually appear in the form of collective bargaining agreements, *see, e.g., Bidlack,* 993 F.2d at 605, the parties have pointed to no authority, and the court has found none, which forbids the vesting of welfare benefits via another form of written contract.

Defendants argue that there was no such separate written contract and that the Lloyds program, described in the Lloyds 1987 booklet, ceased when it was superseded by the subsequent Daiwa 1990 booklet and later by the SPDs. Therefore, continue Defendants, as the Daiwa 1990 booklet and the SPDs do not provide retirement medical benefits, Defendants are not liable to Salamouni for such benefits.

### 1. Separate Written Contract

■ Assuming, *arguendo,* that ERISA allows written modifications which are not part of collective bargaining agreements, the court must examine the written documents which Salamouni contends modify the Lloyds 1987 booklet. The only written modification introduced by Salamouni is Yasui's letter promising "plan benefits on terms no less favorable" than those provided by Lloyds.

Defendants contend that Yasui's letter was not an "offer" which was "accepted" by Salamouni to form a contract. However, the court notes that the letter contained a typed signature line for "acceptance," which was signed and dated by Salamouni. Defendants offer nothing in support of their contention that the letter did not constitute a contract. Drawing all inferences in favor of Salamouni, as the court must at this phase of litigation, the court infers that the letter was, indeed an offer and that Salamouni's signature indicated his acceptance. Given the offer and acceptance, the court finds that the parties contracted to modify the provisions of the Lloyds 1987 booklet via the Yasui letter.

In the letter, Daiwa promised to provide benefits to Salamouni which were "no less favorable" than Lloyds'. In order to measure whether Salamouni's Daiwa benefits were "on terms no less favorable" to Salamouni, the court must first determine which benefits Salamouni had at Lloyds.

### B. Benefits Provided by Lloyds

■ Again, the parties do not dispute that, under the Lloyds 1987 booklet, the Lloyds program could be amended, modified, or terminated at Lloyds' sole discretion. The Lloyds 1987 booklet indicated that benefits, which included retirement medical benefits, would terminate when the group policy ceased. As Lloyds could terminate the program, logic dictates that Lloyds could also modify the program. *See Ryan v. Chromalloy Am. Corp.,* 877 F.2d 598, 604 (7th Cir. 1989).

The termination provision was the functional equivalent of a "reservation of rights clause," which specifically reserves an employer's right to terminate or modify a welfare benefit plan. *See Murphy v. Keystone Steel & Wire Co., a Div. of Keystone Consol. Indus., Inc.,* 61 F.3d 560, 566–67 (7th Cir. 1995); *In re Unisys Corp. Retiree Med. Benefit "ERISA" Lit.,* 58 F.3d 896, 905 (3d Cir. 1995) (holding that reservation of rights provision in benefit plan which purported to give lifetime retirement welfare benefits demonstrated employer's intent not to vest those benefits) (cited in *Diehl v. Twin Disc. Inc.,* 102 F.3d 301, 307 (7th Cir.1996)). Where a plan contains a reservation of rights clause, a beneficiary cannot reasonably read the plan to vest welfare benefits. *See In re Unisys,* 58 F.3d at 907. As such, under the Lloyds 1987 booklet, Salamouni had a right to changeable retirement medical benefits.

Therefore, when Salamouni received the Yasui letter contractual right to benefits "no less favorable" than Lloyds', he received the contractual right to a continuation of changeable retirement medical benefits. The issue then becomes one of when, if ever, *see Bidlack,* 993 F.2d at 607, and what, if anything, superseded the Lloyds 1987 booklet.

### C. *Effect of Daiwa 1990 Booklet and Daiwa SPDs*

 Defendants argue that the Daiwa 1990 booklet and subsequent SPDs supersede the benefits accorded to Salamouni under the Lloyds 1987 booklet. However, Salamouni contends that the Daiwa programs referenced by Defendants do not apply to him.

The Daiwa 1990 booklet referenced by Defendants specifically covers "non-executive" employees, rather than executives. All parties agree that Salamouni was an executive. Consequently, Salamouni avers that the Daiwa 1990 booklet and subsequent SPDs cannot form the basis of a summary judgment against Salamouni.

Of course, Defendants disagree. They offer testimony that the Daiwa 1990 booklet is relevant to the court's summary judgment inquiry. They offer the oral testimony of Daiwa's benefits administrator to the effect that, although the Daiwa 1990 booklet referenced by Defendants does pertain only to non-executives, the corresponding executive booklet was the same in essentially all aspects, save vision care, physicals, and deductible amounts. Defendants state that "Daiwa does not automatically maintain copies of superseded medical benefits booklets" and that "Daiwa did not introduce the 1990 medical benefits booklet applicable to executives because it was unable to locate a copy." (Reply at 14–15.) The court finds it ironic that Defendants introduce extrinsic evidence of Daiwa's 1990 executive plan, where they insist that the court disregard any extrinsic evidence introduced by Salamouni regarding his particular benefit plan.

At the summary judgment phase, the court rejects the testimony, as well as the irrelevant Daiwa 1990 (non-executive) booklet. The parties agree that Salamouni was an executive. The court cannot find that a non-executive booklet, which does not apply to Salamouni, supersedes the benefits accorded to Salamouni under the Lloyds 1987 booklet.

Thus, the question becomes whether the Daiwa SPDs superseded the Lloyds 1987 booklet. They did, and Salamouni does not contend otherwise. Those SPDs changed the retirement medical benefit provisions of the Lloyds 1987 booklet. Those changes were permissible; as discussed above, in the Yasui letter, Daiwa retained the right to make them.

The Daiwa 1995 SPD outlined the welfare benefit program which was in effect at the time of Salamouni's retirement. *See Sprague v. General Motors Corp.,* 92 F.3d 1425, 1438 (6th Cir.1996) (noting that plan documents in effect at the time of retirement control, provided that those documents were distributed to employees before retirement). Salamouni received the Daiwa 1995 SPD before his retirement.

The Daiwa 1995 SPD contains no provision for retirement medical benefits. Indeed, it states that Daiwa "does not promise the continuation of any benefits nor does it promise any specific level of benefits at or during

retirement." [6] (Hinchey Dep. Ex. 1. at 4.) As such, the Daiwa 1995 SPD, like its 1992 predecessor, eliminated retirement medical benefits from Salamouni's welfare benefit plan. The elimination was permissible, as Daiwa retained the right to change Salamouni's welfare benefits through the Yasui letter and the Lloyds and Daiwa plan language. Although Salamouni may have unfortunately believed otherwise, accordingly, Salamouni is not entitled to retirement medical benefits.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is granted.

IT IS SO ORDERED.

---

6. An identical phrase appears in the Daiwa 1992 SPD.