Jerry **TRULL;** Don Henson; Floyd Sutton; Earl Johnson; Roderick Rogers; and Joyce Riggs, Individually and as Representative of a class of all persons similarly situated, Plaintiffs,

v.

**DAYCO PRODUCTS, LLC;** Mark IV Industries, Inc.; Dayco Products, Inc. Medical Plan; and Mark IV Industries, Inc. and Subsidiaries Group Welfare Benefit Program, Defendants.

Civ. No. 1:02 CV 243.

United States District Court,
W.D. North Carolina,
Asheville Division.

May 2, 2003.

### MEMORANDUM OF OPINION

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Plaintiffs' motion for class certification to which the Defendants have responded. For the reasons stated herein, the motion is granted.

### I. PROCEDURAL HISTORY

On December 21, 2001, the captioned Plaintiffs filed this action in the United States District Court for the Southern District of Ohio. On September 20, 2002, that Court transferred venue to this District. On October 29, 2002, the undersigned ordered the parties to advise as to the status of certain pending matters and provided a time within which the Defendants should respond

to the motion for class certification, originally filed in the District of Ohio on May 10, 2002. On November 19, 2002, the undersigned entered an Order maintaining the *status quo* of the action and providing the Defendants additional time within which to respond to the motion for class certification. Although no reply briefs to the Defendants' response were allowed by that Order, the Plaintiffs' motion for leave to file such a reply will be granted for the reasons stated therein.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 23 sets forth a two-part test for certifying a class action. First, the Plaintiffs must show four prerequisites: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims ... of the representative parties are typical of the claims ... of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).

> [T]he final three requirements of Rule 23(a) "tend to merge," with commonality and typicality "serv[ing] as guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir.1998) (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). If each of these prerequisites is met, then the putative class must show that it fits into one of three categories specified in Rule 23(b). Unless each prerequisite is met, a determination under Rule 23(b) is unnecessary. *Broussard, supra*, at n. 3.

In ruling on a motion for class certification, the district court must accept the allegations of the complaint as true. *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 81 (D.Md.1991). Nonetheless, the burden of establishing the right to certification remains with the proponents thereof. *Stastny v. Southern Bell Tel. & Tel. Co.*, 628 F.2d 267 (4th Cir.1980).

The Court will first determine whether the prerequisites of Rule 23(a) have been met. If so, the provisions of Rule 23(b) will then be applied.

## III. ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

On June 19, 2002, Plaintiffs filed the first amended complaint in order "to enforce the terms of certain Group Benefits Agreements entered into between Dayco [Products, Inc.] and Local No. 277, United Rubber, Cork, Linoleum and Plastic Workers of America ('Local 277') and to enforce both Section 515 of the Employee Retirement Income Security Act of 1974, as amended ('ERISA'), 29 U.S.C. § 1145, and Section 301 of the Labor Management Relations Act of 1947, as amended ('LMRA'), 29 U.S.C. § 185." [1] First Amended Class Action Complaint ("Amended Complaint"), filed June 19, 2002, at 4. At issue is the provision of health insurance benefits for retired employees of Dayco who were members of Local 277 at Dayco's Waynesville, North Carolina, plant. That plant closed all operations in 1998. *Id.*, at 7.

Local 277 negotiated with Dayco management for benefits to cover its members in 1968, 1971, 1974, 1977, 1980, 1990 and 1995. *Id.*, at 8. In each of these agreements, with the exception of the 1995 agreement, Dayco agreed to provide health insurance to employees who retired from Local 277 at no cost.[2] *Id.*, at 9. "When an employee at De-

---

**1.** Dayco Products, L.L.C., is the successor corporation to Dayco Products, Inc., by virtue of a corporate reorganization which occurred in July 2001. Amended Complaint, at 6. The plant at issue was operated by Dayco Products, Inc., and is referenced herein as "Dayco." Dayco Products, L.L.C., is a wholly owned subsidiary of Mark IV Industries, Inc. (Mark IV). *Id.*, at 7.

**2.** The May 1990 agreement provided that beginning in 1994, those employees who retired there-

after would contribute $30 per month toward insurance. That agreement was amended by a 1992 addendum which provided that employees who retired between 1992 and 1995 could elect to retire under the terms of the 1990 agreement as amended. That amendment deleted the reference to contribution commencing in 1994. However, if an employee retiring between July 3, 1992 and May 1, 1995 did not make such an election, he would contribute $30 per month toward insurance. Amended Complaint, at 10.

fendant's Waynesville plant retired, he was entitled to receive the benefits set forth in the Agreement in effect at the time of his retirement, for life. The benefits promised to retirees were vested and could not be reduced after the employee retired. The same benefits were also promised, for life, to the surviving spouse of each covered retiree, following the retiree's death." *Id.*

In 1992, Dayco and Local 277 entered into an addendum to the 1990 agreement pursuant to which caps[3] were imposed on the amount that Dayco would be required to pay for health insurance for employees who retired after the date of the agreement. *Id.* Plaintiffs allege the provisions of the addendum precluded enforcement of it in the event that the Dayco plant closed. *Id.*, at 10. Nonetheless, in 1999 and again in 2001, after the plant had closed, Defendant Mark IV[4] announced that the costs of providing insurance to the retirees had exceeded the caps specified in the 1992 addendum and it began to charge monthly premiums to retirees for their insurance. *Id.*

The last agreement negotiated by Local 277 was in 1995. Dayco "represented" to Local 277 that the caps would increase by five percent each year as to future retirees. *Id.*, at 11. However, Dayco began to charge retirees health insurance premiums without application of the five percent cap increase. *Id.*

Another issue in this dispute involves co-payments for prescription drug and other medical expenses. Prior to 2000, retirees paid a co-payment for each such expense with the insurance carrier paying the balance. *Id.*, at 12. The co-payments made by the retirees were subject to a yearly maximum amount after which the carrier paid all such costs. *Id.* The co-payments were also counted toward that maximum along with the actual cost of the product. *Id.* After 2000, members were forced to pay more money for

out-of-pocket expenses before the carrier would pay 100 percent of the expense. *Id.*

By virtue of these actions, Plaintiffs have alleged six claims of violations of LMRA and ERISA.

## IV. DISCUSSION

Plaintiffs have described the class as "[a]ll persons who retired from the Local 277 bargaining unit having met the eligibility requirements for retiree medical coverage, plus the surviving spouses of such retirees who died before the initial [c]omplaint was filed in this matter or who die while this action is pending." Plaintiffs' Motion for Class Certification, filed May 10, 2002, at 1. Each of the named representatives falls within this definition. *Id.*

There are two subclasses; Subclass A includes class members (i) who retired prior to July 2, 1992; (ii) who retired between July 2, 1992, and July 30, 1995, and who elected to be treated as pre-addendum retirees; or (iii) who are the surviving spouses of these retirees. *Id.* The representatives of Subclass A are Plaintiffs Trull, Henson and Sutton.

Subclass B includes class members (i) who retired between July 2, 1992, and July 30, 1995, and who did not elect to be treated as pre-addendum retirees; (ii) who retired after July 30, 1995; or (iii) who are the surviving spouses of these retirees. The representatives of Subclass B are Plaintiffs Johnson, Rogers and Riggs.

### A. Numerosity.

■ The first prerequisite of Rule 23(a) is that "the class is so numerous that joinder of all members is impracticable." The proposed class here consists of "more than 800 Waynesville employees;" 470 of those 800 retirees fall within Subclass A; 330 fall within Subclass B. *Id.*, at 6–7. Plaintiffs argue

---

**3.** Although not defined in the complaint, it appears that "caps" refers to the maximum cost for health insurance coverage which Dayco would pay on behalf of the retirees. "Provided that the cost of coverage under the Plan does not exceed $3,500 for pre-Medicare retirees or $1,900 for Medicare-eligible retirees, there will be no cost to [a retiree] for coverage under the Medical Plan as a retiree." Amended Complaint, at 11. Thus,

once the "cap" was exceeded, the retiree was expected to contribute to the cost of the insurance.

**4.** Mark IV is the plan administrator for the Dayco Products, Inc. Group Medical Plan, the employee welfare benefit for Dayco employees, including the Plaintiffs. Amended Complaint, at 7.

that classes with far fewer members .have been approved and cite the difficulty these retirees, who are on a fixed income, would have in prosecuting the action individually.

Defendants argue that the focus should not be on the cumulative number of employees who retired but on the number of employees who retired under each bargaining agreement. They also argue that because all of the retirees remain in the general area of the plant, there is no need for a class action.

In *Bittinger v. Tecumseh Products Co.,* 123 F.3d 877 (6th Cir.1997), the Court noted that "Rule 23(a) requires the court to find that 'the class is so numerous that joinder of all members is impracticable.' The class is composed of over 1100 retirees. The district court explicitly found, and we agree, that joinder of so many parties would be impracticable." *Id.,* at 884 n. 1; *see also, Diehl v. Twin Disc, Inc.,* 102 F.3d 301 (7th Cir.1996); *Gable v. Sweetheart Cup Co., Inc.,* 35 F.3d 851, 854 (4th Cir.1994) ("In January 1990, several Maryland Cup retirees filed suit against Sweetheart Cup ... claiming that their benefits had vested at the time of their retirement and that the 1989 benefit reduction amendment therefore violated ERISA. The district court certified a class of plaintiffs including all of defendants' retired employees (and their beneficiaries) who retired before October 1, 1985, and were participants in the plan as of June 1, 1989."). The joinder of 800 retirees would be as impractical as the joinder of 1,100 retirees. Moreover, the size of individual claims and the inconvenience of trying individual suits warrants a finding in favor of the Plaintiffs' having met the numerosity requirement. *See, e.g. Bradford v. AGCO Corp.,* 187 F.R.D. 600, 603 (W.D.Mo. 1999) (citing *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 559 (8th Cir.1982)).

## B. Commonality.

■ The next requirement pursuant to Rule 23(a) is that questions of law and/or fact be common to the class. " 'The ... commonality requirement[ ] of the Federal Rules ensure that only those plaintiffs ... who can advance the same factual and legal arguments may be grouped together as a class.' " *Broussard,* 155 F.3d at 340 (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 341 (7th Cir.1997)). Defendants argue that the bar-

gaining agreements are so numerous and diverse in their provisions that Plaintiffs cannot establish commonality.

The April 4, 1968, agreement provides, as is relevant to this litigation, that employees who retire shall continue to receive hospital, surgical and medical benefits. Exhibit H, *attached to* Plaintiffs' Motion for a Preliminary Injunction ("Plaintiffs' Exhibit"), filed December 27, 2001, at 18. In addition, the surviving spouse of an employee who retires on or after April 2, 1968, shall continue to receive those benefits until death or remarriage. *Id.,* at 19. The contract had no provisions related to prescription drug expenses and contained no limit as to the amount the employer would pay for the insurance premium. Likewise, the employee was not obligated to pay an annual "deductible;" that is, once the employee had spent a certain sum out of his own "pocket," the insurance would then pay 100 percent of the costs. Defendants have described this agreement as providing "basic" insurance coverage to the retirees. *See,* Exhibit A, Exhibits to Defendants' Response to Plaintiffs' Motion for Class Certification ("Defendants' Exhibit") filed November 26, 2002. Such insurance provided basic coverage for medical and surgical procedures as enumerated in the policy. *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.,* 936 F.2d 98, 100 (2nd Cir.1991).

As to the issues relevant in this action, the April 1, 1971, agreement was virtually identical to the 1968 contract. Plaintiffs' Exhibit G. Likewise, the April 29, 1974, agreement contained the same provisions except that, for the first time, prescription drug benefits were offered to both employees and employees who retired after the effective date of the contract. Plaintiffs' Exhibit F. The co-payment for which the retiree was responsible was $1.00. *Id.,* at 37. The same coverage was provided by the January 6, 1977, and January 10, 1980, agreements. Plaintiffs' Exhibits D and E.

On January 1, 1985, the agreement for the first time required a 10 percent contribution by the employees for the costs of certain medical procedures as well as a yearly "out-of-pocket" or deductible clause. Plaintiffs'

Exhibit C, at 12, 24. Retirees, however, received these new benefits as did their surviving spouses until death or remarriage. *Id.* Defendants have described this agreement as providing "major medical" coverage. Defendants' Exhibit A. Such insurance supplemented the "basic" coverage. *Masella, supra.*

The May 26, 1990, contract for the first time added lifetime maximum benefits and specified "co-insurance," *i.e.,* the plan would pay 80 percent of each expense and the employee would pay 20 percent thereof. Plaintiffs' Exhibit B, at 12. However, once the employee's annual deductible was met, the plan paid 100 percent of the expenses. *Id.* And, for the first time, the contract provided that for "employees retiring after May 2, 1994, $30.00 per month will be deducted from the retiree's check for medical coverage." *Id.,* at 51. Nonetheless, the retiree's spouse would continue to receive coverage until remarriage or death. *Id.,* at 52. Defendants have described this contract as providing "comprehensive" insurance coverage. Defendants' Exhibit A. "At that time, the 'basic major medical component' was being replaced with a 'comprehensive medical component,' which had deductibles and a co-insurance provision not part of the earlier program." *Etherington v. Bankers Life & Cas. Co.,* 747 F.Supp. 1269, 1272 (N.D.Ill. 1990).

> At one time, it was common for [insurance] policies to narrowly provide coverage of only one type of health care expense, with a given policy focusing solely on one of the following types of expenses: (1) surgery; (2) "medical" defined as doctor fees unrelated to surgery and, depending on the policy, diagnostic or treatment procedures; or (3) hospitalization, consisting primarily of room and board charges. The coverages provided under these narrow categories eventually expanded to encourage outpatient and preventive care, and most health care insurance is now in the form of broader policies that are called "major medical," "comprehensive," and the like.

1 *Couch on Insurance,* § 1:46 (3rd ed.).

On July 2, 1992, an addendum to the 1990 agreement was signed by the President of the Union and Dayco's Human Resources Manager. Defendants' Exhibit M, at 00064. The Addendum provided a "cap" on the amount Dayco would be obligated to pay for medical insurance for employees who retired after July 2, 1995. The Addendum also contained the following provisions:

> The Company and Union Negotiating Committee agree to adopt an addendum to the existing contract, which shall incorporate the following:
>
> .        .        .        .        .
>
> A guarantee that this memorandum does not apply if the plant is closed.
>
> An option for employees eligible to retire under the existing labor agreement to retire any time during this contract, or within the first 90 days of the effective date of the next contract, and to elect that their benefits be treated identically to the pre-addendum retirees.

*Id.*

The last agreement at issue in this case is the May 1, 1995, contract which is described as a Health Maintenance Organization (HMO) plan. Plaintiffs' Exhibit A. HMO "is a generic term for prepaid health coverage plans that provide medical services to relatively large population[s] at fixed rate[s]; its salient characteristics are that it assures contractual responsibilities for providing health care services to subscribers, is [a] closed health care system, has voluntarily enrolled members, requires fixed and periodic payment by members, and assumes financial risk." *Couch, supra,* at n. 66.5. The 1995 contract provided that Dayco would pay the full cost of insurance premiums for the employee who would pay a maximum of $20 per month for dependents. Plaintiffs' Exhibit A, at 30.

> Provided that the cost of coverage under the Plan does not exceed $3,500 for pre-Medicare retirees or $1,900 for Medicare-eligible retirees, there will be no cost to you for coverage under the Medical Plan as a retiree.

*Id.,* at 63.

> The surviving spouse of [ ] a deceased employee who has retired on or after April 29, 1974 ... shall be entitled to continue to

receive the benefits of this medical plan until death or remarriage . . . .

*Id.*, at 68–69.[5]

Defendants argue there is no commonality because (1) the terms of the various bargaining agreements differ widely; (2) there are discrepancies in the dates of retirement of the retirees; (3) there were different negotiators involved in the contract formations and different understandings of what was said and meant during those negotiations; (4) there are differences among the basic, major medical, comprehensive, and HMO contracts; (5) at the time of retirement, the retirees were provided information about their benefits which differs from the terms of the actual agreements; and (6) the retirees' base their claims not on the contract language but on their individual understandings of what was to be provided to them.

One hundred, twenty-nine Dayco employees retired under the terms of the 1968, 1971, 1974, 1977 and 1980 contracts which provided "basic" health and medical insurance coverage. As noted above, these contracts were virtually identical with the exception that beginning in 1974, the retirees paid a $1 co-payment for drugs. Each of those contracts provided that the retirees' surviving spouses would receive medical benefits until death or remarriage.

Under the terms of the 1985 and 1990 contracts, which are virtually identical, 328 Dayco employees retired. These retirees were obligated to make co-payments for all medical expenses, not just prescription drug costs, and there was an annual deductible to be met before the plan paid 100 percent of the expenses. Both of these contracts contain the "until death or remarriage" language.[6]

The 1992 addendum required retirees to pay $30 per month for insurance premiums; however, only 62 retirees retired under the terms of this addendum. The 1995 agreement also provided that retirees would contribute toward the cost of insurance, but only for a dependent and even then, the maximum

was $20 per month. Both the 1992 addendum and the 1995 agreement provided a cap on the amount the company was obligated to pay for insurance. Again, both contracts contain the "until death or remarriage" language.

The undersigned does not find the lack of commonality argued for by the Defendants. For the purposes of this motion, what may or may not have been said during contract negotiations is of no moment because the language of the agreements is clear and unambiguous. *Air Line Pilots Ass'n Int'l v. Midwest Express Airlines, Inc.*, 279 F.3d 553, 557 (7th Cir.2002) ("But negotiating history is just what the parol evidence rule does *not* allow to be used to vary the terms of a written contract intended to be the final, integrated expression of the parties' deal."). Likewise, information which may or may not have been told to any retiree at the time of his or her retirement cannot vary the clear terms of the agreements. *Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1157–58 (9th Cir.2000) ("Although the parol evidence rule is not applied as strictly in the context of collective bargaining agreements, it still operates to bar extrinsic evidence of an agreement inconsistent with an unambiguous writing.").

> Because an employer's obligation to a . . . fund is determined by the plain meaning of the language used in the collective bargaining agreement, the actual intent of the contract parties (*i.e.*, the employer and the local union) is immaterial when the meaning of that language is clear. Consequently, an employer is not permitted to raise defenses that attempt to show that the union and the employer agreed to terms different from those set forth in the agreement.

*Bakery & Confectionery Union & Industry Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir.1997)(internal citations omitted); *accord, Clark v. Ryan*, 818 F.2d 1102, 1105 (4th Cir.1987) ("Because the disputed language is neither ambiguous

---

**5.** A chart summarizing the plans is attached to this opinion as Attachment A.

**6.** The 1990 agreement also provided that effective after 1994, retirees would contribute $30 per

month towards the cost of their insurance. That provision never took effect due to the amendments to the agreement.

nor uncertain, the district court's decision to admit parol evidence was error."); *Carr v. Philips Elec. North America Corp.*, 41 Fed. Appx. 637, 641 (4th Cir.2002)("Because the evidence was at odds with the unambiguous terms of the [collective bargaining agreement], striking it was proper. Although normal rules of contract interpretation are applied more loosely in the context of collective bargaining agreements, courts nevertheless will bar extrinsic evidence that is inconsistent with an unambiguous writing." (Internal citations omitted)).

The various dates when retirees retired are not at issue; the issue is the particular bargaining agreement under which a retiree retired. While the coverage provided by Dayco began with "basic" insurance and culminated in an "HMO," the differences in the coverage are not the issue; the issue is the coverage provided to the retiree by the agreement under which he or she retired. Therefore, it is immaterial that the agreements have different terms. The issue for resolution is the coverage provided pursuant to the bargaining agreement under which the retiree retired. "What we are looking for is a common issue the resolution of which will advance the litigation." *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). "[T]he proper interpretation of the plan [i]s at issue." *Id.* "In the instant case, each class member claims that the [ ] collective bargaining agreement guaranteed them lifetime, fully-funded benefits. This common question is all that is required under the Rule." *Bittinger*, 123 F.3d at 884.

### C. Typicality.

■ The third prerequisite of Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class...." Fed.R.Civ.P. 23(a). "Typicality under Rule 23(a)(3) means that there are 'other members of the class who have the same or similar grievances as the plaintiff.'" *Bradford*, 187 F.R.D., at 603

(quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir.1977)).

"Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.... A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members."

*Sprague*, 133 F.3d at 399 (quoting Herbert B. Newberg and Alba Conte, 1 *Newberg on Class Actions*, § 3–13, at 3–75, 76 (3d ed.1992)). Defendants argue that the representatives "are pursuing claims that differ not only as compared to the claims of other class members, but also as compared to the claims of other named Plaintiffs." Defendants' Response, at 19. However, a comparison of the representatives, the sub-classes, and the summary of the bargaining agreements shows the Defendants are creating "atypicalities" which do not exist.

Subclass A, represented by Trull, Henson and Sutton, includes class members who either retired prior to July 2, 1992 (Sutton), or who retired between July 2, 1992, and July 30, 1995, but who elected to be treated as if they had retired under the 1990 agreement (Trull and Henson).[7] Trull and Henson, who both retired in 1995, elected to retire under the pre–1992 addendum retirement package, that is, the 1990 agreement. Defendants' Exhibit B, Deposition of Jerry Trull, at 26–28; Defendants' Exhibit I, Deposition of Donald J. Henson, at 32–33. Sutton retired in 1989; thus, he retired under the 1985 agreement which for the first time provided a 10 percent co-payment on all medical expenses. Defendants' Exhibit E, Deposition of Floyd Sutton, at 50. This subclass expected to receive health insurance coverage for life. Some members of the group would be required to make larger co-payments, *i.e.*, between $1 and $4 co-payments for drugs or 10 percent versus 20 percent co-payments for all medical expenses.[8] Some members had

---

7. It also includes the surviving spouses. However, the language of every contract covered these spouses and, therefore, they do not present issues of typicality.

8. It is also worth noting that those retirees who were the recipients of the pre–1980 agreements

are at this point over the age of 85. The numbers of those retirees still surviving is not known. However, it is clear that the majority of the retirees who will be class members retired from 1985 onward.

yearly deductibles to be met; and, those who retired after May 1994 would be required to contribute $30 per month toward the cost of the insurance. But, "[m]ore importantly, [Trull, Henson and Sutton]—like each [sub-]class member—contend[ ] that [Dayco] originally planned to provide lifetime, fully-funded benefits to retirees, as a general matter. That the evidence varies from plaintiff to plaintiff would not affect this basic claim.…" *Bittinger,* 123 F.3d at 884.

The same reasoning applies to the representatives of Subclass B, Johnson, Rogers and Riggs, who represent those class members who retired between July 1992 and July 1995 but who did not elect to retire under the 1990 agreement and those who retired after July 1995. In other words, these class members retired under either the 1992 addendum or the 1995 agreement, as amended by the 1997 agreement. Johnson retired in 1997 under the terms of the 1995 agreement. Defendants' Exhibit J, Deposition of Earl Johnson, at 15. He acknowledged co-payments and, for the first time in the 1995 agreement, caps on the amount Dayco would contribute toward the cost of insurance. *Id.,* at 14–15. Rogers and Riggs both retired in June 1995, that is, under the 1995 agreement. They also acknowledged the provisions of that agreement. Defendants' Exhibit C, Deposition of Joyce Hamilton Riggs, at 39; Defendants' Exhibit D, Deposition of Roderick Newton Rogers, at 13. "It may be that the best remedy to both the purportedly atypical claims and defenses would be to create subclasses." *Bittinger,* 123 F.3d at 884. That is precisely what these representative have done.

"Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Bradford, supra.* Such is the case here. *See, e.g., Bittinger, supra; Diehl, supra; Stearns v. NCR Corp.,* 297 F.3d 706 (8th Cir.2002), *cert. denied,* — U.S. —, 123 S.Ct. 977, 154 L.Ed.2d 895 (2003); *Scardelletti v. Debarr,* 265 F.3d 195 (4th Cir.), *rev'd on other grounds,* 536 U.S. 1, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002); *Canseco v. Constr. Laborers Pension Trust for Southern California,* 93 F.3d 600 (9th Cir.1996); *Webb v. GAF Corp.,* 78 F.3d 53 (2d Cir.1996); *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* 57 F.3d 1255 (3rd Cir.1995); *Groover v. Michelin North America, Inc.,* 187 F.R.D. 662 (M.D.Ala.1999); *Kohl v. Association of Trial Lawyers of America,* 183 F.R.D. 475 (D.Md.1998).

### D. Adequacy of Representation

■ The final hurdle under Rule 23(a) is that the "representative parties will fairly and adequately protect the interests of the class.…" Fed.R.Civ.P. 23(a). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Defendants raise four arguments against the class representatives: (1) their individual interests are antagonistic to class members; (2) they are not in a position to vigorously prosecute the case; (3) class counsel has a conflict of interest; and (4) the labor union is in reality in control of the litigation. Defendants' Response, at 22.

The first argument stems, in part, from the fact that three of the named Plaintiffs have pending actions to recover for workplace exposure to asbestos. Thus, Defendants argue, these three have personal angst against the company sufficient to warrant a conclusion that they seek to negatively impact the financial condition of the company. This, Defendants claim, would result in a failed company which could not reimburse the membership at large. And, the asbestos litigation could result in duplicative recovery.

It is first noted that Dayco closed its doors in 1998. The fund available to these retirees is administered by Mark IV and, it would be assumed, that a successor corporation continues to fund the plan. *See, e.g., Keffer v. H.K. Porter Co., Inc.,* 872 F.2d 60 (4th Cir.1989). The argument that these representatives have a personal vendetta against the Defendants sufficient to bankrupt one or more of them is at odds with the representatives' desire to receive the benefits of the plan. *Broussard,* 155 F.3d at 338 ("[P]laintiffs' residual, forward-looking interest, as current franchisees, in Meineke's continued viability

would have tempered their zeal for damages and prejudiced the backward-looking interests of former franchisees."); *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574, 579 (W.D.N.C. 2000) (In a case before the undersigned, class certification denied on the ground that the plaintiff had previously brought an identical action against a different credit card company but never pursued class certification once a settlement was offered to him individually. "This pattern of behavior certainly belies Plaintiff's statement that his primary interest is consumer advocacy. Indeed, it may be that, like others, Plaintiff earns a good living by bringing these suits under the threat of a class action, leverage which is then used to attain a settlement.... Plaintiff's failure to zealously pursue a class action in his prior case weighs heavily against his lofty claim of 'consumer advocacy' in this one."). Here, the class representatives have the same interest at the class members—the continued receipt of the benefits of the plan—and any recovery in this action will inure only to the benefit of that plan, not to individual beneficiaries. *Adcox v. Teledyne, Inc.*, 21 F.3d 1381 (6th Cir. 1994).

As to any potential asbestos recovery, such claims are distinct from litigation to maintain employee retirement benefits. Trull's claim is pending before the North Carolina Industrial Commission for his diagnosed condition of asbestosis. Defendants' Exhibit B, Trull Deposition, at 69. And, he acknowledged that if his medical expense is paid pursuant to an award of workers' compensation, the same expenses would not be paid under his health benefits plan. *Id.*, at 72–73. Likewise, Rogers, who also has asbestosis and a claim pending with the Industrial Commission, has the same understanding. Rogers Deposition, attached to Plaintiffs' Reply Brief, at 98. Johnson, who also has asbestosis, has apparently already received a settlement of his claim, a fact which removes any stigma against him. Defendants' Exhibit J, Johnson Deposition, at 114 ("Q: It's done, settled? A: Which I'm sure you knew that."). Thus, the claims in the asbestos matters are not duplicative of those at hand which address entirely different legal and factual matters. *See, e.g., Bellas v. CBS, Inc.*, 201 F.R.D. 411, 422 (W.D.Pa.2000) (Fact that named plaintiff in class action for imper-

missibly amending employee welfare plan was also a plaintiff in an age discrimination suit against the same defendant was insufficient reason to bar his service as a class representative.).

Trull was a member of the Union's negotiating team in connection with the 1974, 1980, 1985, 1990 and 1992 agreements. Johnson was a member in connection with the 1985, 1990, 1992, 1995 and 1997 agreements. Defendants argue that their service on these teams creates a conflict of interest. "In the event that the contracts are construed as not providing for lifetime benefits, which is the mostly (sic) likely result, the class members may have claims against the Union ...." Defendants' Response, at 24. Thus, Defendants conclude, Trull and Johnson would have interests antagonistic to the class because as members of the negotiating team, their service may come under fire. This argument is belied by the Plaintiffs' deposition testimony. *See, e.g.,* Defendants' Exhibit B, Trull Deposition, at 54–57 ("[P]aragraph 3 was our proposal and our understanding that a guarantee [was provided] if we give them this imaginary cap that there would be no individual ... affected by the cap prior to ... July 2nd 1995.... I had an option to retire with what we agreed to in 1990 and they was telling me how much better it was going to be in '95, but I had 90 days to make up my mind whether I wanted what we had agreed on in 1990 or take what the '95 agreement was...."); Defendants' Exhibit J, Johnson Deposition, at 22 ("I know what I've got in the '95 agreement and the other people know what they had in their agreement, and they were supposed to keep it for a lifetime."). The Court finds the Defendants' arguments of antagonism exaggerated.

Defendants next attack the ability of Plaintiffs' retained counsel to represent the class because that law firm has also represented the Union Local 277. Defendants claim that deposition testimony from class representatives shows the possibility of an action against the Union itself for breaching their duty of fair representation. However, any such action is long since time-barred. *Meekins v. United Transp. Union*, 946 F.2d 1054, 1057 (4th Cir.1991) (Noting the six

months statute of limitations imposed on actions by an employee against the union pursuant to 29 U.S.C. § 160(b)); *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

Defendants also argue that because the Union agreed to finance the suit, there is a conflict of interest between the law firm and the class.[9] This point is based on the North Carolina Rules of Professional Responsibility, Rule 1.8(f)(3), which provides that an attorney "shall not accept compensation for representing a client from one other than the client unless [ ] information relating to representation of a client is protected as required by Rule 1.6." Defendants note that it is "[e]qually disturbing ... that the Union is funding the suit, but no steps have been taken to ensure that client confidences are not being disclosed to the Union. On the contrary, the Plaintiffs assume that all such information is being shared with the Union ...." Defendants' Response, at 29.

It is first noted that Defendants would be unaware of steps taken by the firm to avoid disclosure of confidential information. Moreover, Rule 1.6 provides that an attorney "shall not reveal information acquired during the professional relationship with a client unless the client gives informed consent [or] the disclosure is impliedly authorized in order to carry out the representation ...." N.C. Rev. Rules of Prof'l Conduct R. 1.6(a). Plaintiff Johnson testified that despite the fact that the law firm represented the Union, "if I had had to have picked [a firm], I'd have picked them." Johnson Deposition, *attached to* Plaintiffs' Reply, at 145. He understood that the Union was financing the litigation and had no concern of a conflict of interest. *Id.*, at 139–140. The other named Plaintiffs testified that they had agreed to be named plaintiffs because the Defendants' actions were affecting class members at large. Such representations indicate an implied understanding that some information may be provided to the Union. Again, however, the

Defendants would not be aware of all steps taken by the law firm to prevent the disclosure of confidential information.

Nor can the Court find, based on the language of the retainer agreement and the knowledge of the named Plaintiffs disclosed during depositions, that the Union is actually controlling the litigation. The Defendants' objections amount to mere speculation and hypothetical issues of conflict which are not sufficient to deny certification. *Becher v. Long Island Lighting Co.*, 164 F.R.D. 144, 152–53 (E.D.N.Y.1996). The case itself is not factually or legally distinct from the normal litigation brought by employees against employers for breaches of ERISA and/or LMRA. And, based on the experience of Plaintiffs' counsel, they are entirely competent to prosecute this action.

### E. Rule 23(b)

■ Having concluded that each of the prerequisites of Rule 23(a) have been met, the provisions of Rule 23(b) must be addressed. Plaintiffs seek certification pursuant to Rule 23(b)(2) which provides in pertinent part:

An action may be maintained as a class action of the prerequisites of subdivision (a) are satisfied, and in addition:

\*     \*     \*     \*     \*     \*

[T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole....

Fed.R.Civ.P. 23(b)(2). Defendants' sole objection to certification pursuant to this clause is that there is no uniformity of grounds which will make declaratory and injunctive relief appropriate for the class as a whole.

The Advisory Committee Notes provide that

[t]his subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive na-

---

9. In this regard, the Court rejects without discussion claims that the named Plaintiffs have no interest in the suit, have no knowledge of the suit, do not understand who is directing the litigation, *etc.* The background and experience of these individuals belies these claims, despite their manner of speaking and their direct, honest

responses to questions during depositions. As aptly noted by Mr. Johnson during his deposition, defense counsel had elicited a desired response by asking him a misleading question. Defendants' Exhibit J, Johnson Deposition, at 151. The fervor and sanguinity of these individuals is not lacking.

ture or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief.... Subdivision (b)(2) is not limited to civil rights cases.

5 *Moore's Federal Practice 3D*, § 23App.04[2]. Here, the final relief sought is a declaration that the Defendants may not deviate from the bargaining agreements and injunctive relief to prevent deviation in the future. *McGlothlin v. Connors*, 142 F.R.D. 626, 640 (W.D.Va.1992) (Certification pursuant to Rule 23(b)(2) was appropriate where plaintiffs sought declaratory judgment against defendant to increase employer contributions to trust fund.); *Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir.2003) (Recognizing that Rule 23(b)(2) certification may be appropriate where monetary relief is incidental to equitable relief.); *accord, Eubanks v. Billington*, 110 F.3d 87, 92 (D.C.Cir.1997); *Bower v. Bunker Hill Co.*, 114 F.R.D. 587, 596 (E.D.Wash.1986) (Certification pursuant Rule 23(b)(2) proper where plaintiffs sought declaratory relief against defendant regarding medical benefits of retirement plan.); *Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 778–82 (9th Cir.1986) (Certification pursuant to Rule 23(b)(2) was proper where class sought an injunction for improper calculation of retirement benefits since monetary relief from recalculation was incidental to the injunctive relief.).

Indeed, the Defendants do not seriously argue that Rule 23(b)(2) is inapplicable to this case. The Court, therefore, finds that class certification is appropriate and that notice to the class members would be appropriate because of the incidental monetary relief sought. Class counsel will be provided an opportunity to advise the Court of the most efficient manner of providing notice.

## V. ORDER

IT IS, THEREFORE, ORDERED that the Plaintiffs' motion for leave to file reply brief is **ALLOWED.**

IT IS FURTHER ORDERED that the Plaintiffs' motion for class certification is **GRANTED** and the following Class is hereby certified:

All persons who retired from the Local 277 bargaining unit having met the eligibility requirements for retiree medical coverage, plus the surviving spouses of such retirees who died before the initial complaint was filed in this matter or who die while this action is pending.

The Class consists of two subclasses. Subclass A includes class members (i) who retired prior to July 2, 1992; (ii) who retired between July 2, 1992 and July 30, 1995 and who elected to be treated as pre-addendum retirees; or (iii) who are the surviving spouses of these retirees. The representatives of Subclass A are Plaintiffs Trull, Henson and Sutton.

Subclass B includes class members (i) who retired between July 2, 1992 and July 30, 1995 and who did not elect to be treated as pre-addendum retirees; (ii) who retired after July 30, 1995; or (iii) who are the surviving spouses of these retirees. The representatives of Subclass B are Plaintiffs Johnson, Rogers and Riggs.

IT IS FURTHER ORDERED that on or before 15 days from entry of this Order, class counsel shall advise the Court in writing of the proposed method of notice to class members.

The Clerk of Court is instructed to schedule the initial pretrial conference before the undersigned with all due expediency.

### ATTACHMENT A
### THE BARGAINING AGREEMENTS AT ISSUE

| Date | Type | Co–Pay | Deductible [1] | Premium [2] | Cost Cap [3] | Language [4] |
|------|------|--------|------------|---------|----------|-----------|
| 4-2-68 | Basic | No | No | No | No | Yes |

1. "Deductible" refers to the annual amount of out-of-pocket expenses to be paid by the retiree before the employer would pay 100% of the cost.

2. "Premium" refers to whether the retiree was obligated to contribute toward the costs of the insurance premium.

3. "Cost Cap" is the cost of the insurance policy past which the employer would require the retiree to pick up all payment; *i.e.*, $3000 per year per retiree.

4. "Language" means whether the policy provided for coverage to the surviving spouse of a retiree "until death or remarriage."

| 4–1–71 | Basic | No | No | No | No | Yes |
|---|---|---|---|---|---|---|
| 4–29–74 | Basic | Co-pay for Prescription Drugs | No | No | No | Yes |
| 1–6–77 | Basic | Co-pay/drugs | No | No | No | Yes |
| 1–10–80 | Basic | Co-pay/drugs | No | No | No | Yes |
| 1–1–85 | Major Medical | 10% co-pay All medical Expenses | Yes | No | No | Yes |
| 5–26–90 | Comprehensive | 20% co-pay All medical Expenses | Yes | $30 per mo. after 1994 | No | Yes |
| 7–3–92 | Comprehensive | 20% | Yes | $30 per mo. | Yes | Yes |
| 5–1–95 | HMO | 20% | Yes | $20 per mo. | Yes | Yes |